**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: § | |
| § | |
| AMIT KUMAR BANSAL, § | Case No. 20-34292 (CML) |
| § | |
| Debtor. § | (Chapter 7) |

**RESPONSE AND LIMITED OBJECTION OF VINMAR INTERNATIONAL, LTD. TO TRUSTEE'S APPLICATION FOR AUTHORIZATION TO RETAIN AND EMPLOY VALUATION EXPERT PURSUANT TO 11 U.S.C. §§ 327, 328, AND 330**
(Relates to Docket No. 70)

**TO THE HONORABLE CHRISTOPHER M. LÓPEZ,
UNITED STATES BANKRUPTCY JUDGE:**

Vinmar International, Ltd. ("**Vinmar**"), a creditor and party in interest, respectfully files this Response and Limited Objection ("**Objection**") to the *Trustee's Application for Authorization to Retain and Employ Valuation Expert Pursuant to 11 U.S.C. §§ 327, 328, and 330* (Docket No. 70) (the "**Application**") filed by Christopher R. Murray, duly appointed Chapter 7 trustee ("**Trustee**") for the bankruptcy estate of Amit Kumar Bansal, Debtor (the "**Debtor**"), as follows:

**SUMMARY OF THE OBJECTION AND RELIEF REQUESTED**

1. The authorization sought in the Application should be denied without prejudice. Instead, for the reasons stated below, approval of the retention and employment of the valuation expert should be subject to and conditioned upon the Trustee furnishing the Court, creditors and parties in interest, including Vinmar, with the Statement of Work that is referred to as ***Exhibit C*** to the Application, but which was omitted. This omission is material, and Vinmar submits that in the absence of the Statement of Work, the Court should deny the Application. After contacting counsel for the Trustee and requesting the Statement of Work, Vinmar's undersigned counsel was unsuccessful in either obtaining access to the Statement of Work or resolving this Objection.

**SPECIFIC RESPONSES PURSUANT TO FED. R. BANKR. P. 7008**

2.      Vinmar admits the allegations in Application paragraphs 1 through 11.  Vinmar is without sufficient knowledge or information to know the truth of the allegations in Application paragraphs 12 through 14 or 16 through 22.  Application paragraph 15 is a request for relief to which Vinmar objects.  Application paragraph 17 erroneously states that *Exhibit C* (Statement of Work) accompanies the Application, which Vinmar denies.

**RELEVANT FACTS**

3.      The Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on August 26, 2020 (the "**Petition Date**").  The Trustee is the duly appointed Chapter 7 trustee for the Debtor's bankruptcy estate.

4.      Vinmar is holder of the largest claim against the Debtor's estate.  The claim is a $35.7 million claim based on a final judgment issued in Texas state district court against the Debtor.  (*See* Proof of Claim No. 10.)  Vinmar contends this debt is not dischargeable.  (*See* Complaint, Adversary Proceeding No. 20-03485, Docket No. 1.)  Vinmar's claim represents about 90% to 95%, in amount, of the monetary claims against the estate.

5.      In his schedules, the Debtor disclosed a 0.5% Class B limited partnership interest (the "**Tricon Interest**") in Tricon International, Ltd ("**Tricon")** with the value listed as "unknown".  (Schedule A/B: Property, Docket No. 34, Item No. 19.).  The Debtor did not claim an exemption in the Tricon Interest.

6.      The Application seeks authority to retain and employ Grant Thornton LLP ("**GT**") to provide the Trustee with a valuation of the Tricon Interest.  On information and belief, Tricon

is a billion-dollar business enterprise that is affiliated with Debtor's employer.[1]  As the Trustee notes, Tricon and Vinmar are competitors, and Vinmar was Debtor's previous employer.

7.      By means of their respective offers (the "**Offers**"), on November 10, 2020, Tricon offered to purchase the Tricon Interest for $610,274.00, and on December 21, 2020, Vinmar offered to purchase the Tricon Interest for $1,200,000.00, subject to certain conditions, one of which was obtaining a fair valuation of the Tricon Interest.  The Application is the Trustee's undertaking to obtain some form of valuation of the Tricon Interest.

## ARGUMENT AND AUTHORITIES

### A. The Statement of Work is an essential part of the GT Engagement Letter.

8.      The Application states that it includes *Exhibit B* (Engagement Letter) and *Exhibit C* (Statement of Work) setting forth the terms of GT's engagement.  However, the Application omits the Statement of Work that it identifies as Exhibit C to the Application.  Indeed, the Engagement Letter signed by GT and the Trustee, which identifies the omitted Statement of Work as being attached, states:

> **Delivering the Services**
>
> The Services we provide to you under this Agreement will typically be set forth in distinct Statement(s) of Work signed by Grant Thornton and your authorized representative, specifying matters including ***applicable professional standards, scope, deliverables***, timing, fees and payment terms.

Engagement Letter at p. 2 (Docket No. 70-2, p. 2 of 11)(emphasis added)

9.      The omission of the Statement of Work is significant and, in Vinmar's view, fatal to the Application.  Approval of the Application should be conditioned on the Court's approval of the Statement of Work.

---

[1] On information and belief, Tricon controls, is controlled by, or is under common control with Debtor's employer, Tricon Energy, Inc.

**B. AICPA Standards Applicable to the Engagement Letter Mandate "Agreed Upon Procedures" that should be contained in the Statement of Work.**

10.     The Application contemplates an engagement that must, under applicable financial accounting standards, be specific regarding the "agreed upon procedures" that define the scope of services to be performed. Without sufficient specificity in the defined scope of the agreed upon procedures, GT may fail to deliver the services that are essential to provide a proper and appropriate valuation under the facts of the instant case. If the Statement of Work is deficient or erroneous to encompass the scope of the work that is required, it is likely that the resulting valuation will be off the mark from what needs to be determined.

11.     Unlike an audit, review, or compilation engagement performed by a certified public accounting professional, an agreed-upon procedures engagement involves the practitioner performing (a) specific procedures that (b) the engaging party has agreed to and acknowledged to be appropriate for the intended purpose of the engagement, and (c) reporting on findings based on the procedures performed. Agreed Upon Procedures Engagements, AICPA Professional Standards: Statements on Standards for Attestation Engagements No. 19, as amended, §§ .07 - .34, *et seq.*, pp. 5-10 (AICPA, 2019). The Engagement Letter as filed does not fulfill this requirement.

**C. The Agreed Upon Procedures are Essential to Ensure that the Valuation Serves the Best Interests of Creditors.**

12.     Agreed upon procedures should be seen as an appropriate disclosure obligation for an accounting professional engaged to perform services on behalf of the bankruptcy estate, without which, even if there is no actual harm to the bankruptcy estate, the bankruptcy system may be harmed. 11 U.S.C. § 327(d). *In re LSS Supply, Inc*. 247 B.R. 280 (Bankr. D. Ariz. 2000). This is especially true in this case, where Tricon, which holds an interest adverse to the estate, is at least one prospective purchaser of the Tricon Interest. *See Hanley v. Hanley*, 64 Misc. 3d 1202, 116 N.Y.S.3d 496 (N.Y. Sup. Ct. 2019) (holding that the plaintiff's claim of minority oppression was

not defeated because, among other reasons, the absence of any description of the accountant's methodology pursuant to the agreed-upon procedures was troubling when the client representative/majority owner had a strong pecuniary interest in the outcome of the valuation).

### D. Tricon Appears to Believe it is the Sole Eligible Purchaser and is Not Obligated to Pay Fair Market Value.

13. Tricon, as an offeror and purported sole eligible buyer, is more likely than not advocating for a very low valuation and a very circumscribed valuation process. Contrary to Vinmar's view, Tricon maintains that provisions of the Fourth Amended and Restated Agreement of Limited Partnership of Tricon International, Ltd. (the "**Tricon Agreement**") − excerpts of which have been provided to Vinmar's counsel outside the limitations of a protective order – restrict the Trustee's proposed valuation and sale processes for the Tricon Interest. Tricon appears to maintain that (a) the valuation date and valuation methodology are strictly governed, even in bankruptcy, by value-limiting provisions in the Tricon Agreement that do not require determining fair market value, and (b) the Tricon Agreement authorizes no person other than Tricon to acquire the Tricon Interest, even in a bankruptcy case.

14. In Tricon's view, but not Vinmar's, the Tricon Agreement's provisions dictate that value must be determined in accordance with a book value calculation as of a date certain determined by Tricon in its sole discretion, without taking account of what the actual fair market value of the Tricon Interest might be or whether the value is affected in any manner by the date of sale. Vinmar, however, does not believe that a sale in bankruptcy is strictly limited as Tricon may assert. Rather, Vinmar submits that Tricon's methodology, if followed, will greatly depress the value of the Tricon Interest, including by limiting the opportunity for other parties to submit competing purchase offers to acquire that interest.

**E. The Tricon Interest is the Asset of Greatest Value in Debtor's Estate, and the Statement of Work Will Determine Whether the Valuation Is Appropriate.**

15. The Statement of Work is the specific writing that governs the scope and details of the valuation expert's professional undertaking. The Statement of Work will be a significant factor in determining whether the valuation methodology and resulting valuation are proper and appropriate, as contrasted with an inappropriate "rubber stamp" of whatever value Tricon assigns to the Tricon Interest. Notably, the Trustee has arranged for Tricon to pay for the valuation.

16. Tricon also appears to believe that no party but Tricon can purchase the Tricon Interest, which is a proposition that has not yet been tested in this case. The existing range of more than $500,000 in the Offers to purchase the Tricon Interest − comparing the offer by Tricon ($610,274.00) and the offer by Vinmar ($1,200,000, subject to several conditions) − means that the valuation determination can mean as much as a $450,000 difference in the amount that Vinmar (holder of over 90% of claims against the estate) might recover on its claim in this case.

17. The Tricon Interest is the only disclosed asset of the bankruptcy estate with substantial value available for the payment of creditors' claims. Vinmar, as holder of a claim in the amount of more than $35 million against the estate, is the party that will suffer most if the value is understated and the amount collected from a sale of the Tricon Interest by the estate yields a price below fair-market-value. As reflected in Vinmar's purchase offer, the Tricon Interest appears to have considerable financial value.

18. On information and belief, from Debtor's ownership of the Tricon Interest, Debtor was receiving substantial distributions from Tricon, at least from 2013 until 2018. Debtor's personal tax returns for the years 2014-2018 reflect substantial "Taxable Foreign Source Taxable Income" distributions from Tricon to Debtor, as shown in Schedule K-1 reports of his share of partnership income. Debtor has reported in his sworn interrogatory responses that he was paid as

his "Salary, Partnership" the following amounts: $567,302 in 2013, $279,878 in 2014, and $746,263 in 2016. Vinmar supplied this information and supporting documents to the Trustee prior to the first meeting of creditors in this case. On information and belief, the only partnership from which Debtor received a salary in those years was Tricon, as opposed to his current corporate employer, Tricon Energy, Inc., which reportedly paid additional W-2 wages to him.

### F. The Court Has Latitude in Deciding the Valuation Methodology and Sale Process.

19. Assuming, without admitting, that the Tricon Agreement contains provisions that purport to limit the sale and purchase price of the Tricon Interest, the Court is not obligated to enforce such limitations. In *Ebert v. Devries Family Farm, LLC (In re Devries)*, the court held that it need not enforce the valuation provision in the company's Redemption Agreement. In that decision, the value of the Redeemed Units was a contested matter given that the Company is a privately held corporation, so the value was not readily determinable. The court held that it would not enforce the valuation provision in the Redemption Agreement because the Redemption Agreement merely reflected the Book Value of the Redeemed Units. Nos. 11-43165-DML-7, 12-04015-DML, 2014 Bankr. LEXIS 3621, at *50-51 (Bankr. N.D. Tex. Aug. 27, 2014).

20. While the court noted that information such as Book Value may be useful in determining solvency under the "balance-sheet test," courts will "quickly recognize that a *fair* valuation [of a debtor's assets] cannot be ascertained by looking solely at the balance sheets." *Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 403 (S.D. Tex. 2008) (emphasis added) (citing *Orix Credit Alliance, Inc. v. Harvey (In re Lamar Haddox Contractor, Inc.)*, 40 F.3d 118, 121 (5th Cir. 1994)). Instead, the court noted that the trustee would still need to engage a process to arrive at the fair value of the Redeemed Units such as engaging a private firm to value the Membership Units or providing a fairness opinion of the debtor's previous transaction. *Id.* at *51.

7

21. A court is also not bound to always enforce provisions limiting sale. A bankruptcy court generally retains discretion in determining whether a provision in an executory contract hinders the possibility of assignment to a sufficient degree to render it unenforceable. *See In re E-Z Serve Convenience Stores, Inc.*, 289 B.R. 45, 50 (Bankr. M.D. N.C. 2003); *Hannaford Bros. Co. v. Ames Dep't Stores, Inc. (In re Ames Department Stores, Inc.*), 316 B.R. 772, 794-95 (Bankr. S.D.N.Y. 2004); *In re The IT Group, Inc.*, 302 B.R. 483, 487-489 (D. Del. 2003). In particular, if a right of first refusal provision "hamper[s] the Debtors' ability to assign the property or foreclose the estate from realizing the full value of the Debtors' interest in [the] ... LLC" the provision may be unenforceable. *Northrop Grumman Tech. Servs. v. Shaw Group Inc*. (*In re IT Group, Inc.),* 302 B.R. 483 (D. Del. 2003). A court examines the particular facts and circumstances of the transaction to determine if the provision burdens these rights to such an extent. *Id*.

22. Likewise, a bankruptcy court has considerable discretion in approving sales by trustees and is "granted ample latitude to strike a balance between fairness, finality, integrity, and maximization of assets." *In re Wilson*, No. 11-50396-rlj-7, 2014 Bankr. LEXIS 3151 (Bankr. N.D. Tex. 2014) (citing *In re Farmland Indus., Inc*., 289 B.R. 122, 126 (B.A.P. 8th Cir. 2003)). "[I]t is clear the court may regulate the mechanism of a sale outside the ordinary course…" *Id*. In doing so, the court "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *In re Cont'l Air Lines, Inc*., 780 F.2d 1223, 1226 (5th Cir. 1986) (quoting *In re Lionel Corp*., 722 F.2d 1063, 1071 (2d Cir. 1983)). In *In re Wilson*, the court weighed these considerations and refused to enforce a provision of the LLC agreement limiting sale because it undermined the trustee's power to realize

fair value of the LLC ownership asset, especially given rights of a judgment creditor to enforce a charging order on units under state law. No. 11-50396-rlj-7, 2014 Bankr. LEXIS 3151.[2]

## CONCLUSION

23. In conclusion, to avoid being misunderstood, Vinmar does not object to the Trustee's retention and employment of a valuation expert, and Vinmar generally does not object to GT or Mr. John Baumgartner being employed in that capacity. However, in the specific circumstances of this case, the agreed upon procedures are essential to ensure that the expert properly determines the value of the Tricon Interest, and the effective date of the valuation. Therefore, it is essential to be able to review and assess *Exhibit C*, the Statement of Work. Vinmar submits that the Court should condition retention and engagement of the valuation expert on an Application that is complete, discloses satisfactory agreed-upon procedures, and otherwise complies with the requirements of 11 U.S.C. §§ 327, 328, and 330.

## REQUEST FOR RELIEF

WHEREFORE, Vinmar requests that the Court enter the proposed form of order accompanying this Objection, or another appropriate order denying the Application without prejudice, and grant such other relief as the Court deems just and proper.

Dated: September 13, 2021.   Respectfully submitted.

/s/ *Mark S. Finkelstein*
Mark S. Finkelstein
Texas Bar No. 07015100 | S.D. Texas No. 5543
1001 McKinney Street, Suite 1100
Houston, Texas 77002
T: (713) 646-5503 | F: (713) 752-0337
Email: mfinkelstein@smfadlaw.com

*Counsel for Vinmar International, Ltd.*

---

[2] Pre-bankruptcy, Vinmar obtained a state-court issued charging order dated June 19, 2018 with respect to the Tricon Interest entitling Vinmar to receive distributions from Tricon on account of the Tricon Interest, but Vinmar has received no amounts on account of any such distributions.

OF COUNSEL

SHANNON, MARTIN, FINKELSTEIN,
   ALVARADO & DUNNE, P.C.
1001 McKinney Street, Suite 1100
Houston, Texas 77002

## BLR 9013-1 CERTIFICATE OF PRIOR CONFERENCE

I, Mark S. Finkelstein, hereby certify that prior to filing the foregoing Objection, on Thursday, September 9, 2021, at 3:35 p.m., I emailed Trustee's counsel Miriam Goott with a request that she provide the undersigned with a copy of the Statement of Work. No response was received that day, the following business day or as of the time of this filing four days later. I made a follow up phone call to Ms. Goott's office the morning of September 13, 2021 at 8:40 a.m. and left a message with the gentleman who answered, leaving a phone number and requesting a call-back. After several hours, no call-back was received. No conference was held, so it may be necessary to submit the matter to the Court for determination.

                                                   */s/ Mark S. Finkelstein*
                                                   Mark S. Finkelstein

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2021, a true and complete copy of the foregoing Objection was duly served to all registered ECF users appearing in the case, including the Chapter 7 Trustee and his counsel, Miriam Goott, and is being mailed the next business day by regular first class mail, postage prepaid to those who do not receive electronic service.

                                                   */s/ Mark S. Finkelstein*
                                                   Mark S. Finkelstein